## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

UNITED STATES OF AMERICA,

                        Plaintiff,

    v.                                          No. 1:16-cr-10063-JDB-1

LONNIE EDWARD GEORGE

                        Defendant,

## DEFENDANT LONNIE GEORGE'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO THE FIRST STEP ACT, 18 U.S.C. §3582(c)(1)(A)(i)

David W. DeBruin*  
D.C. Bar No. 337626  
JENNER & BLOCK LLP  
1099 New York Ave NW, Suite 900  
Washington, DC 20001  
(202) 639-6015  
ddebruin@jenner.com  

Abraham G. Kanter†  
D.C. Bar No. 90008992  
JENNER & BLOCK LLP  
1099 New York Ave NW, Suite 900  
Washington, DC 20001  
(202) 637-6361  
akanter@jenner.com  

Michael T. Werner†  
IL Bar No. 6314250  
JENNER & BLOCK LLP  
353 North Clark Street  
Chicago, IL 60654  
(312) 923-4792  
mwerner@jenner.com  

*Attorneys for Defendant*

\* Pro hac vice pending.  
† Not admitted in the Western District of Tennessee; practicing under the supervision of Jenner & Block LLP.

## INTRODUCTION

Lonnie Edward George is a 60-year-old man who is currently serving a sentence in federal prison for a nonviolent drug offense. Mr. George has terminal, stage IV prostate cancer and could have as little as 18 months left to live. If Mr. George remains in prison for the term of his sentence, he will likely die there—an outcome made more probable by the Bureau of Prisons' ("BOP") inadequate care for his cancer and other medical conditions.

Diagnosing and treating Mr. George's cancer took twice as long as it should have. Tragically, this delay could be directly responsible for Mr. George's cancer reaching a stage where it can no longer be cured. When Mr. George's prostate tumor was first detected by MRI in April 2022, there was no sign that it had yet metastasized. But it was not until January 2023 that the BOP brought Mr. George to an oncologist. By that point, Mr. George's cancer had metastasized and was incurable. Although impossible to know, if Mr. George had been able to promptly receive medical care, doctors may have been able to remove the tumor before the cancer spread.

If released, Mr. George will focus on obtaining proper medical care and will be able to spend his remaining time with his family. Mr. George has a deep interest, expressed in his own letter to the Court, in doing good for his family, his community, and himself. His support network is caring and strong. His daughter and fiancé (a longtime family friend and a rehabilitation counselor) have written letters to the Court expressing their desire to care for him and to be a part of his life.

For these extraordinary and compelling reasons, as well as the compatibility of his release with applicable sentencing factors, Mr. George requests that the Court reduce his sentence to time served. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

**I.     Factual and Procedural Background**

Lonnie Edward George is currently incarcerated at the Federal Medical Center in Butner, North Carolina ("FMC Butner"). Mr. George worked in construction for most of his life and started his own contracting business in 2013. *See* [Doc. No. 112] at 22; Ex. 5 at 1-2. Prior to his

1

incarceration, Mr. George lived in Trenton, Tennessee, where he also grew up. [Doc. No. 112] at 20. He has a close relationship with his two sisters, three brothers, and two adult children, several of whom also continue to live in the Trenton area. *Id.*

On June 30, 2016, Mr. George was arrested for a nonviolent federal drug offense related to the purchase and sale of methamphetamine. [Doc. No. 36]. On January 27, 2017, Mr. George pled guilty to one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine. [Doc. Nos. 84, 85]; *see* [Doc. No. 115] at 1. On May 4, 2017, he was sentenced to 140 months in prison and five years of supervised release. [Doc. No. 115] at 2-3. Mr. George began serving his federal sentence at the Federal Correctional Institution in Memphis, Tennessee ("FCI Memphis") on August 25, 2021.[1] Ex. 1 at 1. Since entering federal prison, Mr. George has had no disciplinary incidents and has completed several educational courses, including a drug education course. *Id.* at 2. Counting pre-trial credit, Mr. George has served over two years and nine months of his federal sentence. *Id.* at 1. Mr. George is projected to be released to home confinement on August 26, 2030, taking into account good-time credit. Ex. 4 at 6.

In December 2021, Mr. George received an abnormal result on a prostate-specific antigen ("PSA") test. Ex. 2, ¶ 9; Ex. 3 at 3. The same test was repeated later that month, and Mr. George was referred to a urologist who ordered an MRI. Ex. 2, ¶ 10; Ex. 3 at 5; Ex. 10 at 3. The MRI was performed in April 2022 and showed that Mr. George had a lesion on his prostate. Ex. 2, ¶ 11; Ex. 10 at 9, 12. Critically, at that time, there was no evidence that the cancer had yet metastasized beyond the prostate. Ex. 2, ¶ 11. A prostate biopsy was performed in June 2022, which confirmed that Mr. George had prostate cancer. Ex. 2, ¶ 12; Ex. 3 at 8-9; Ex. 10 at 13, 17. In October 2022, Mr. George underwent a prostate-specific membrane antigen positron emission

---

[1] Before serving his federal sentence, Mr. George completed a six-year sentence in Tennessee state prison. *See* Judgment, *State v. George*, Case No. 19428 (Tenn. Cir. Ct., Gibson Cnty. Jan. 23, 2019).

tomography and computed tomography ("PSMA-PET/CT") scan. Ex. 2, ¶ 13; Ex. 3 at 18; Ex. 10 at 21. This scan found that Mr. George's cancer had metastasized beyond the prostate. *Id.*

In January 2023, Mr. George saw an oncologist, Dr. Bilawal Ahmed, who reviewed Mr. George's medical records and test results and concluded that Mr. George's condition had progressed to stage IV metastatic prostate cancer and was incurable.[2] Ex. 2, ¶¶ 14, 17; Ex. 10 at 24. Less than 50% of stage IV metastatic prostate cancer patients survive five years past their diagnosis. Ex. 2, ¶ 7. Dr. Ahmed started Mr. George on a series of hormone therapy treatments to slow the cancer's course, including an injection that must be given every six months, and a pill that must be taken daily. *Id.*, ¶ 14.

Dr. Ahmed describes the normal timeline to diagnose prostate cancer, which is significantly shorter than the time it took to diagnose Mr. George. "The usual timeline for diagnosing prostate cancer is to perform a biopsy within three months of an elevated prostate-specific antigen (PSA) test." *Id.*, ¶ 8. Mr. George's biopsy came in June 2022, six months after his abnormal PSA test. *Id.*, ¶ 12. After a positive biopsy, a PSMA-PET/CT is usually performed "within two months of the biopsy." *Id.*, ¶ 8. Mr. George's PSMA-PET/CT came in October 2022, over four months after his positive biopsy. *Id.*, ¶¶ 12-13. Dr. Ahmed explains that, though Mr. George's cancer cannot be cured, timely medical appointments to monitor Mr. George's response to his treatment are critical. *Id.*, ¶ 17.

But the BOP has failed to bring Mr. George to timely appointments with his oncologist. The BOP did not bring Mr. George to a scheduled follow-up appointment with Dr. Ahmed on March 23, 2023. *Id.*, ¶ 18. As of the filing of the present motion, Mr. George has not been to a single follow-up visit with Dr. Ahmed. In addition, in January 2023, Mr. George was

---

[2] The BOP's records from January 2023 note that Mr. George "was previously under care of" a BOP doctor who "no longer works here." Ex. 3 at 22. They also note that Mr. George "has sparse medical records" in the BOP system and that the BOP "contacted his oncologist . . . and [was] awaiting his response to form a plan of care" in late January 2023. *Id.* at 23. The BOP medical records assert that Mr. George was "[s]tarted on chemotherapy on 1/20/23." *Id.* But the drugs Mr. George's oncologist recommended, and that Mr. George started on January 20, 2023, are hormone therapy drugs, not chemotherapy drugs. Ex. 2, ¶ 14.

3

recommended for a transfer to a medical facility. Ex. 3 at 20-21. By February 2023, Mr. George had been approved for that transfer. Ex. 4 at 3. However, Mr. George was not transferred to FMC Butner until May 2023.

Mr. George's quality of life has been impacted dramatically by his condition. "Prostate cancer at stage IV is often painful, both due to the cancer and due to the treatment." Ex. 2, ¶ 16. In the last year, Mr. George has started to experience severe musculoskeletal pain and fatigue throughout the day. His neck pain is "so sever[e] that [it] is hard to hold [his] head up." Ex. 5 at 1. To get his medication, Mr. George "ha[s] to be pushed to pill call in a wheelchair." *Id*. And the side effects of his medication "make[] [him] sick all the time and out of breath." *Id.*

Mr. George suffers from other serious medical conditions, as well. He has type II diabetes, hyperlipidemia (high cholesterol), hypertension (high blood pressure), and partial blindness and pain in his right eye due to a mature cataract. Ex. 3 at 24-26. Over a year ago, an ophthalmologist recommended that Mr. George receive eye surgery to treat this cataract. *Id.* at 1-2, 7; *see id.* at 15. But Mr. George still has not received that surgery.

In February 2023, through undersigned counsel, Mr. George sent a letter to the Warden at FCI Memphis to request that the BOP file a motion for compassionate relief on his behalf.[3] Ex. 6. Over 30 days have passed, and Mr. George has not received a response. *Id.*; Ex. 7.

---

[3] Mr. George began seeking compassionate release in March 2022. That month, Mr. George sent a handwritten letter to the Warden of FCI Memphis requesting that the BOP file a motion for compassionate release based on the conclusions drawn by a urologist over his abnormal PSA test. In May 2022, Mr. George's daughter, Tiffany Miller, attempted to file a motion for compassionate release in this Court, but the motion was rejected because Ms. Miller is not an attorney. [Doc. Nos. 140, 141]. In June 2022, Mr. George attempted to file a pro se motion, but the Court denied this motion on exhaustion grounds. [Doc. Nos. 142, 148]. In September 2022, Mr. George renewed his compassionate release request to the Warden via email. Ex. 13. In October 2022, Mr. George filed a request that the Court construed as a second compassionate release motion. [Doc. No. 149]. That motion, too, was denied on exhaustion grounds. [Doc. 150]. The prior exhaustion issues were cured before the filing of the present motion.

## II. Legal Background

"The compassionate release statute authorizes [a] district court to reduce an inmate's sentence if the court finds that 'extraordinary and compelling reasons' warrant a reduction . . . and that the § 3553(a) factors, to the extent they apply, support a reduction." *United States v. Sherwood*, 986 F.3d 951, 953 (6th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)). District courts have substantial discretion to determine what qualifies as an "extraordinary and compelling" reason for release. *United States v. McCall*, 56 F.4th 1048, 1054 (6th Cir. 2022). Although not dispositive, the United States Sentencing Commission Policy Statement, U.S.S.G. § 1B1.13, provides "helpful guidance" to the analysis.[4] *United States v. Bright*, No. 16-CR-10049, 2022 WL 2056191, at *2 (W.D. Tenn. June 7, 2022) (Breen, J.) (quoting *United States v. Tomes*, 990 F.3d 500, 503 n.1 (6th Cir. 2021)). District courts often look to § 1B1.13 to determine the core reasons for release that are extraordinary and compelling—while recognizing that they have discretion to recognize other reasons outside that core. *See, e.g.*, *United States v. Kilgo*, No. 20-CR-118, __ F. Supp. 3d __, 2023 WL 150608, at *1-2 (S.D. Ohio Jan. 10, 2023); *United States v. Barrett*, No. 11-CR-173(1), 2022 WL 2964883, at *3-4 (S.D. Ohio July 26, 2022); *United States v. Bolden*, No. 98-CR-107, 2021 WL 2228060, at *3-4 (W.D. Ky. June 1, 2021).

## III. Discussion

### A. Mr. George has exhausted his administrative remedies for relief.

A motion for compassionate release is ripe once the defendant has exhausted all administrative remedies for relief. *Sherwood*, 986 F.3d at 953. The compassionate release

---

[4] Federal law delegates to the Commission authority to define "extraordinary and compelling reasons," *see* 28 U.S.C. § 994(t), and instructs courts to grant compassionate release only when the release would be "consistent with applicable policy statements" of the Commission. 18 U.S.C. § 3582(c)(1)(A). Currently, § 1B1.13 only applies to compassionate release motions brought by the BOP, not motions brought by defendants. *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021). But the Sentencing Commission has promulgated amendments which would apply § 1B1.13 to defendant-filed motions and which would add inadequate medical care as an extraordinary and compelling reason for release. U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254, 28,254 (effective Nov. 1, 2023).

statute provides two options for administrative exhaustion. First, a defendant may file a motion for release after they have "exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." 18 U.S.C. § 3582(c)(1)(A). Second, a defendant may file a motion after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." *Id.* Mr. George has exhausted his administrative remedies under the second prong. He submitted a request for compassionate release to the Warden of FCI Memphis on February 17, 2023. Ex. 6; Ex. 7. As of the filing of the present motion, Mr. George has not received a response. Because more than 30 days have elapsed since Mr. George submitted his request, his administrative remedies are exhausted, and the Court may consider his motion.[5]

### B.     Extraordinary and compelling reasons warrant Mr. George's release.

Mr. George's stage IV terminal metastatic prostate cancer presents an extraordinary and compelling reason for his release both because of the severity of the condition itself and because of the BOP's repeated failure to provide Mr. George with treatment for his condition.

#### 1.     Mr. George's condition is extraordinary and compelling.

Mr. George's prostate cancer is precisely the type of terminal illness contemplated by the compassionate release statute. His condition—a metastatic solid-tumor cancer—is in stage IV, the most serious and advanced stage of cancer. *See* Ex. 2, ¶ 6. According to Mr. George's oncologist, "[t]here is no cure for cancer at this stage" and "[t]he disease has an end-of-life trajectory." *Id.* Section 1B1.13 explicitly provides that medical circumstances are extraordinary and compelling when "[t]he defendant is suffering from a terminal illness," defined as "a serious and advanced illness with an end of life trajectory." U.S.S.G. § 1B1.13, commentary note (1)(A)(i). A "metastatic solid-tumor cancer" is explicitly provided as an example of one such

---

[5] Shortly after Mr. George learned that he was approved to be transferred to FMC Butner, he gave notice, through undersigned counsel, to the Warden of that facility of the compassionate release request that he had already filed with the Warden of FCI Memphis. *See* Ex. 11. Shortly after Mr. George was transferred, he again gave notice to the Warden of FMC Butner. *See* Ex. 12.

6

illness. *Id.* And courts regularly grant compassionate release to prisoners who are suffering from life-ending cancer. *See, e.g.*, *United States v. Karr*, 611 F. Supp. 3d 395, 397 (E.D. Ky. Feb. 18, 2020) (granting compassionate release for a prisoner with stage IV lung cancer); *see also United States v. Tidwell*, 476 F. Supp. 3d 66, 73 (E.D. Pa. 2020) (granting compassionate release for a prisoner with metastatic prostate cancer); *United States v. Beck*, 425 F. Supp. 3d 573, 580-81 (M.D.N.C. 2019) (granting compassionate release for a prisoner with life-threatening breast cancer).

Although a prognosis of a specific life expectancy is not required, Mr. George's cancer has reached a point where he could have as little as 18 months left to live. According to Mr. George's oncologist, less than 50% of patients with cancer as advanced as Mr. George's live five years past their diagnosis. If Mr. George does not respond well to his current treatment, he will likely only live two to four years past his diagnosis (which was over eight months ago). *See* Ex. 2, ¶¶ 7, 17. If not released, Mr. George will likely die in prison.

Further, the pain and side effects from his cancer and treatment are debilitating. Mr. George has started to experience severe musculoskeletal pain, fatigue, and nausea. Ex. 5 at 1. He cannot make it to the pill line to get his medication without a wheelchair. *Id.*

Mr. George' other severe illnesses—type II diabetes, high cholesterol, and high blood pressure—all put him at an even higher risk.[6]

### 2. The BOP has failed to provide Mr. George with access to adequate medical care.

The BOP has also failed to adequately care for Mr. George's cancer—delaying in diagnosing his illness in the first instance and then failing to bring Mr. George to his scheduled oncologist visits. Mr. George's inability to access medical care constitutes an additional and independently sufficient extraordinary and compelling reason for Mr. George's release.

---

[6] *See* Jody A. Charnow, *Multiple Comorbidities Predict Higher-Risk Prostate Cancer*, Renal & Urology News (Apr. 14, 2016), https://www.renalandurologynews.com/home/news/urology/prostate-cancer/multiple-comorbidities-predict-higher-risk-prostate-cancer/ (attached as Ex. 14).

*See*, *e.g.*, *United States v. Roman*, No. 14-CR-43, 2021 WL 3173351, at *4 (S.D. Ohio July 26, 2021) (determining that the BOP's failure to schedule regular appointments for the defendant qualified as an extraordinary and compelling reason), *aff'd*, No. 21-3718, 2022 WL 363866 (6th Cir. Jan 7, 2022); *see also Beck,* 425 F. Supp. 3d at 581 (granting compassionate release because the BOP mismanaged treatment of a prisoner's life-threatening breast cancer); *United States v. Verasawmi*, No. CR 17-254, 2022 WL 2763518, at *9 (D.N.J. July 15, 2022) (granting compassionate release, even though a prisoner had no life-threatening medical conditions, because the BOP failed to give her "the consistent care, monitoring, and treatment required" for her conditions (quoting *United States v. Robles*, No. 19 CR 4122, 2022 WL 229362, at *2 (S.D. Cal. Jan. 26, 2022))); U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254, 28,254 (effective Nov. 1, 2023) (explicitly including inadequate medical care by the BOP as an extraordinary and compelling reason).

It took over twice as long as it should have to diagnose Mr. George's cancer. Once Mr. George received an abnormal PSA test result in December 2021, he should have had a biopsy performed within three months and a PET scan within two months of the biopsy. Ex. 2, ¶ 8. Instead, under the care of the BOP, Mr. George waited over six months to receive an initial biopsy, and another four months after that before a PET scan confirmed the cancer. All told, it took over ten months to confirm that Mr. George had terminal prostate cancer, when it should have only taken five months at most. *Id.*; Ex. 3 at 3-6, 10-11.

The time Mr. George spent waiting for the BOP to diagnose his cancer may have been critical. Mr. George's MRI in April 2022—four months after the PSA test—"did not find metastasis beyond the prostate." Ex. 2, ¶ 11. It was not until the PET scan in October 2022 that there was any indication that the cancer had metastasized to his lymph nodes and bones. This indicates that Mr. George's cancer may have metastasized sometime between April and October 2022. Although impossible to know, if Mr. George had been able to promptly seek out medical care, doctors may have been able to remove the tumor before the cancer spread.

8

Even after the diagnosis of a terminal cancer, the BOP has continued to fail in providing Mr. George with treatment. Although the PET scan confirmed in October 2022 that Mr. George's cancer had metastasized, the BOP did not bring Mr. George to an oncologist, Dr. Bilawal Ahmed, until January 2023. Further, the BOP has not brought Mr. George to any follow-up appointments with Dr. Ahmed, even though Dr. Ahmed had scheduled a follow-up appointment in March 2023. *Id.*, ¶ 18. According to Dr. Ahmed, "[t]imely appointments are critical so that Mr. George can be monitored to determine how he is responding to his current treatment." *Id.*, ¶ 17. Given this fact, the BOP's conduct is inexcusable, extraordinary, and compelling; "the delays in treatment have increased the risk that [Mr. George's] cancer has spread or will recur and has compromised [his] prospects for survival." *Beck*, 425 F. Supp. 3d at 581.

And Mr. George's cancer is not the only medical condition that the BOP has failed to treat. Even though Mr. George is partially blind in his right eye due to his cataract, and experiences significant pain in that eye, the BOP has not yet scheduled cataract surgery. *See* Ex. 3 at 1-2, 7. This lack of treatment is against an ophthalmologist's recommendation, and against common sense.

**C.    Modification of Mr. George's sentence to time served is consistent with the § 3553(a) factors.**

The compassionate release statute instructs the Court to "consider[] the factors set forth in § 3553(a) to the extent that they are applicable" before it grants release. 18 U.S.C. § 3582(c)(1)(A). Section 3553(a), in turn, requires a court to impose a prison term that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). In evaluating § 3553(a) factors, the Court considers changes to the defendant that happen post-sentencing. *See Pepper v. United States*, 562 U.S. 476, 490-93 (2011).

In Mr. George's case, there has been one change that inflects the analysis of each § 3553(a) factor—Mr. George now has been diagnosed with cancer that leaves him in overwhelming pain and will almost certainly end his life. As one Sixth Circuit court has

9

explained, "[a] terminal diagnosis is . . . a highly relevant 'characteristic' that provides an overlay for the Court's evaluation of the pertinent factors." *Karr*, 611 F. Supp. 3d at 403. Considering Mr. George's medical condition, all § 3553(a) factors counsel in favor of release.

### 1. "[T]he history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Despite battling substance abuse disorder for most of his life, Mr. George has maintained strong relationships with his family. He has five siblings, two of whom reside in Trenton, Tennessee. [Doc. No. 112] at 20. Mr. George has two adult children, one who lives in Trenton, and one who recently graduated from the University of Wisconsin. [Doc. No. 112] at 21; Ex. 5 at 2.

Mr. George has demonstrated meaningful rehabilitation while incarcerated. He has worked to overcome his addiction, staying clean and completing a drug education course. Ex. 1 at 2. In this and other respects, Mr. George has been a model inmate since entering federal custody. Despite reduced programming due to the COVID-19 pandemic, he has completed two courses in addition to the drug education course. *Id*. And Mr. George has had no disciplinary incidents while in federal prison. *Id.*

Moreover, Mr. George has accepted responsibility for his offense and, especially since his cancer diagnosis, reflected on his mistakes. In a letter to the Court, he wrote:

> My addiction isolated me. I didn't go to family get-to-gethers. So I missed most of the time being with my kids. I wish to God I had been a better father. I feel as I don't even know them now. Even my Community I should know better. Since being diagnosed with cancer I've come to realize what I have done to the people arround me and my family. I've had alittle over 7 years now locked up and If given the chance I would like to give back to the Community as much as I'm able to. To get out of Prison and spend my last days doing good and what's right would be a blessing.

Ex. 5 at 2.

Mr. George's fiancé, Debra Keathley, who he started dating after he was incarcerated, describes him as a man who "lost sight of his dreams and of reality when the drugs overtook his life" but now is her "best friend and the one who keeps [her] grounded emotionally." Ex. 8 at 2.

10

Mr. George's daughter, Tiffany Miller, who did not talk to her father when he was first incarcerated, describes a changed man with whom she now has a close relationship.  Ex. 9; *see* Ex. 5 at 2.  These personal experiences suggest that Mr. George's "terminal diagnosis and advancing cancer [has had] a positive, clarifying effect."  *Karr*, 611 F. Supp. 3d at 406.

Mr. George's cancer and other medical conditions leave him too weak to be a construction worker again.  But, to the extent he is able during his remaining time alive, he dreams of using his construction industry experience to start a property management business to leave to his children when he dies.  Ex. 5 at 3.

Mr. George's plan to work in his last remaining years demonstrates who he is—an ambitious man with a good heart who went down the wrong path.

> 2. **"[T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).**

Mr. George's crime was undoubtedly serious.  But the time he has spent in federal custody—over two years and nine months, including pre-trial credit, Ex. 1 at 1—has been sufficient punishment for his offense.  Mr. George has served nearly 25% of his statutory term.  Ex. 4 at 6.  Moreover, including the state sentence he completed before his federal sentence, Mr. George has been incarcerated for almost seven years.  At the time Mr. George was sentenced, he was 54 years old, and would have been expected to live around 26 years longer.[7]  His approximately 11.5-year sentence (10 years counting good time credit), though significant, would have left him with ample time out of prison before the expected end of his life.  But now, given his terminal cancer, Mr. George's sentence has effectively become a life sentence.  Such a severe punishment for a nonviolent drug offense was never intended and is much "greater than necessary."  *See* 18 U.S.C. § 3553(a).

---

[7] Social Security Administration, *Period Life Table, 2017*, https://www.ssa.gov/oact/STATS/table4c6_2017_TR2020.html (attached as Ex. 15).

11

In addition, the time Mr. George has served has been excruciating. First, Mr. George has endured intense physical pain due to his cancer and his cancer treatment. Second, from December 2021 through June 2022, Mr. George was living with the uncertainty of not knowing whether he had cancer. And from June 2022 through October 2022, Mr. George knew he had cancer, but did not know whether it would end his life, or whether, as he had hoped, it would be curable. As previously discussed, these periods of time were significantly extended by the BOP's inadequate management of Mr. George's condition. As a result, Mr. George's time at FCI Memphis "has surely been 'significantly more laborious than that served by most inmates.'" *Karr*, 611 F. Supp. 3d at 403 (quoting *United States v. McGraw*, No. 02-cr-00018, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019)).

Further, Mr. George's crime was both non-violent and rooted in his addiction. Ex. 5 at 1; *see United States v. Gregory*, No. 07-CR-73, 2021 WL 5450692, at *4 (N.D. Okla. Nov. 22, 2021) (granting compassionate release for a prisoner who was "a victim of his addiction to opioid pain killers" and whose addiction was "the main force that drove him to" criminal activity).

Courts in the Sixth Circuit have granted compassionate release for prisoners convicted of similar offenses. *See, e.g.*, *United States v. White*, No. 17-CR-00104-2, 2021 WL 268719, at *1 (M.D. Tenn. Jan. 27, 2021) (conspiracy to distribute and possession with intent to distribute more than 50 grams of methamphetamine); *United States v. Thompson*, No. 3:17-CR-170, 2021 WL 2418573, at *1 (W.D. Ky. June 14, 2021) (conspiracy to possess with intent to distribute more than 50 grams methamphetamine).

### 3. "[T]he need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).

The time Mr. George has already served in federal custody is sufficient for the purposes of both specific and general deterrence. Even putting aside Mr. George's rehabilitation, the deterrence calculus is dramatically different now that Mr. George knows he is approaching the end of his life. At the time Mr. George committed the offense, he believed he was near the

middle of his adult life; if he went to prison, he would have expected to eventually get out. Now, however, if Mr. George engages in any more criminal activity upon release, he risks never seeing his fiancé, his children, or his other family again—and risks dying behind bars.

As to general deterrence, reducing Mr. George's sentence would have no effect on others deciding whether to commit similar crimes. Cases like Mr. George's are markedly different from those in which a defendant knew of their terminal diagnosis *before* committing their offenses. In those cases, one may reasonably worry that releasing a defendant early will incentivize those who are terminally ill to commit crimes. But there is "no material risk of future criminality in a reduction based on a post-crime, terminal diagnosis (an extraordinary event) for individuals who, by analogy, would not and could not predict the availability of relief on the ground [Mr. George] now presses." *Karr*, 611 F. Supp. 3d at 404.

### 4. "[T]he need for the sentence imposed . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

If released, Mr. George would pose no danger to the public. He is partially blind, frequently dizzy, often in intense pain, and sometimes confined to a wheelchair. Ex. 5 at 1; Ex. 10 at 24. These are not the traits of a man against whom the public needs protection. And the side-effects of Mr. George's cancer treatment are likely to get worse as the treatment intensifies. In addition, Mr. George is now 60 years old, putting him in a class of prisoners highly unlikely to recidivate.[8]

Even after a reduction in Mr. George's sentence to time served, he would remain under the supervision of the U.S. Probation Office for a five-year term of supervised release—a term that exceeds his life expectancy. [Doc. No. 115] at 3. The conditions of Mr. George's release prevent him from leaving the judicial district of his residence without permission and from changing residence or employment without notifying his probation officer; they also subject Mr.

---

[8] *See* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 23 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publicat ions/2017/20171207_Recidivism-Age.pdf (only 11.4% of offenders released between ages 60 and 64 are reconvicted) (attached as Ex. 16).

George to drug and alcohol testing, and to reasonable searches upon any suspicion that he has violated his conditions of release. *Id.* at 3-4. These restrictions and supervision, combined with support from Mr. George's fiancé and family, will ensure that Mr. George does not recidivate.

### D. Mr. George has a sound release plan.

If Mr. George is released, he will live in Trenton, Tennessee, where he has a vast support network that will help him spend his remaining time alive meaningfully and productively. Mr. George will live with Ms. Keathley, his fiancé. Ms. Keathley has known Mr. George's family for most of her life. Ex. 8 at 1. She and Mr. George plan to get married as soon as he is released. *Id.*

Ms. Keathley is an ideal person for Mr. George to live with because of her firsthand experience with addiction and recovery. Ms. Keathley personally dealt with her own addiction and is a facilitator at Adult & Teen Challenge, a faith-based drug and alcohol recovery program.[9] *Id.* at 1-2. Ms. Keathley's recovery facilitation experience will allow her to guide Mr. George through the final stages of his own recovery. Even while Mr. George has been incarcerated, Ms. Keathley has been an integral part of his rehabilitation, helping reinvigorate his religious commitment by giving him Bible verses to read and praying with him every day. Ex. 5 at 3. Mr. George describes his fiancé as "a source of stability and inspiration in [his] life." *Id.*

Ms. Keathley also plans to support Mr. George in whatever ways are necessary through his cancer treatment, including by taking him to medical appointments (at the Kirkland Cancer Center in Jackson, Tennessee) and providing him care at home. Ex. 8 at 1, 3. Ms. Keathley has experience supporting cancer patients due to the help she provided to her brother-in-law when he was being treated for tongue and throat cancer. *Id.* at 1. In addition, Ms. Keathley has her own network—including her sister, brother, pastor, and Teen Challenge colleagues—who have all committed to supporting and mentoring Mr. George. *Id.* at 2.

---

[9] *See* Adult & Teen Challenge, *Our Program*, https://teenchallengeusa.org/about (attached as Ex. 17).

14

## IV.  Conclusion

Mr. George is a 60-year-old man with terminal, stage IV prostate cancer, struggling to receive treatment while in the custody of the BOP.  Although he cannot make up the time he lost to addiction, he can be a loving husband, a generous father, and a productive member of his community in his final years.  For the foregoing reasons, this Court should grant Mr. George's motion, reduce his term of imprisonment to time served, and order him immediately released to begin his term of supervised release.

Dated: July 10, 2023

Respectfully submitted,

By:  /s/ David W. DeBruin
David W. DeBruin*
D.C. Bar No. 337626
JENNER & BLOCK LLP
1099 New York Ave NW, Suite 900
Washington, DC 20001
(202) 639-6015
ddebruin@jenner.com

Abraham G. Kanter†
D.C. Bar No. 90008992
JENNER & BLOCK LLP
1099 New York Ave NW, Suite 900
Washington, DC 20001
(202) 637-6361
akanter@jenner.com

                                Michael T. Werner†
                                IL Bar No. 6314250
                                JENNER & BLOCK LLP
                                353 North Clark Street
                                Chicago, IL 60654
                                (312) 923-4792
                                mwerner@jenner.com

*Attorneys for Defendant*

\* Pro hac vice pending.
† Not admitted in the Western District of Tennessee; practicing under the supervision of Jenner & Block LLP.